## NATIONAL MACH. CO. v. WHEELER & WILSON MANUF'G CO.

(Circuit Court of Appeals, Second Circuit. February 23, 1897.)

**1. PATENTS—CONSTRUCTION OF CLAIMS—BUTTONHOLE MACHINES.**

In the Osterhout patent, No. 447,791, for an improvement in machines for cutting and stitching buttonholes, claims 21 and 22 are only sustainable by reading into them the jogging or sidewise movement of the stitch mechanism for the purpose of operating the cutter; and neither these claims nor claims 1, 2, 4, 5, 7, 15, and 28 are infringed by a machine made in accordance with the Tebbetts & Doggett patent, No. 438,655, in which the cutter is operated by other means, without any use of the jogging movement. 72 Fed. 185, reversed.

**2. SAME—INTERFERENCE PROCEEDINGS—ACQUIESCENCE.**

Failure of a party to move for dissolution of an interference in the patent office is not an acquiescence in the ruling that the inventions, as limited by the prior art there shown, were identical and patentable. While the decision on interference may be res judicata as to priority, it does not preclude either party from raising other questions.

Appeals from the Circuit Court of the United States for the Southern District of New York.

These are cross appeals from a decree of the circuit court, Southern district of New York, which sustained the validity of United States patent No. 447,791, granted March 10, 1891, to James B. Osterhout, and found infringement of two claims and noninfringement of seven others. The patent is for a machine for cutting and stitching button holes. The specification states that: "One general object of this invention is to provide buttonhole sewing machines with practically successful cutting mechanisms, which shall automatically cut a buttonhole only when the machine is stitching at a predetermined portion, part, or point in the periphery of the buttonhole."

The claims in question are as follows:

"(1) In a buttonhole sewing machine, the combination, with its stitch-forming and work-moving mechanism, of a work-cutter and its carrier normally elevated; a depressor, which ordinarily does not depress the cutter-carrier and cutter; a cutter-controller connected to and moving with the said work-moving mechanism; and connections between the said cutter-controller, cutter-carrier, and depressor, whereby the latter is temporarily caused to depress the cutter-carrier and cutter,—substantially as set forth.

"(2) In a buttonhole sewing machine, the combination, with its stitch-forming and work-moving mechanism, of a work-cutter and its carrier normally elevated; a depressor which is operated by the needle-actuating mechanism of the sewing machine, and which ordinarily does not depress the cutter-carrier and cutter; a cutter-controller connected to and moving with the said work-moving mechanism; and connections between the said cutter-controller, cutter-carrier, and depressor, whereby the latter is temporarily caused to depress the cutter-carrier and cutter,—substantially as set forth."

"(4) In a buttonhole sewing machine, the combination, with its stitch-forming mechanism, work-clamp, and mechanism, including a rotary feed device for operating the work-clamp, of a work-cutter and its carrier normally elevated; a depressor which ordinarily does not depress the cutter-carrier and cutter; a cutter-controller connected to and rotating with the said rotary feed device; and connections between the said cutter-controller, cutter-carrier, and depressor, whereby the said depressor is temporarily caused to depress the cutter-carrier and cutter,—substantially as set forth.

"(5) In a buttonhole sewing machine, the combination, with a stitch-forming mechanism, a work-clamp and mechanism, including a rotary feed device for operating the work-clamp, of a work-cutter and its carrier normally elevated; a depressor operated by the needle-actuating mechanism of the sewing machine; a cutter-controller connected to and rotating with the said rotary feed device; and connections between the said cutter-controller, cutter-carrier, and depressor, whereby the cutter-carrier and cutter are temporarily depressed by the said depressor,—substantially as set forth."

"(7) In a buttonhole sewing machine, the combination, with a stitch-forming mechanism, a work-clamp, and mechanism for operating the work-clamp, of a depressor operated by the actuating mechanism of the sewing machine; a work-cutter, its carrier, means to elevate the cutter-carrier, and means to support it when elevated and disconnected from said depressor; a cutter-controller connected to and moving with the mechanism operating the work-clamp; and connections between the said cutter-controller, cutter-carrier, and depressor, whereby the cutter-carrier is temporarily connected with and depressed by the said depressor, and is thereupon elevated and disconnected from the depressor,—substantially as described."

"(15) In a buttonhole sewing machine, the combination, with a stitch-forming mechanism, a work-clamp, and mechanism for operating the work-clamp, of a cutter-carrier normally elevated, and an attached cutter of suitable length to cut a buttonhole at one insertion; a depressor, operated by actuating mechanism of the sewing machine; a cutter-controller connected to and moving with the mechanism for operating the work-clamp; and connections between the said cutter-controller, cutter-carrier, and depressor, the same being constructed and arranged so as to cause the cutter-carrier and cutter to be depressed by the said depressor to cut a buttonhole when the sewing machine is stitching at or near one end part of one side of the buttonhole,—substantially as set forth."

"(21) In a machine for stitching buttonholes, the combination, with a stitch-forming mechanism, a work-clamp, and mechanism for operating the latter, of a cutter, a cutter-carrier or bar, a depressor operated by the needle-bar actuating mechanism, a cam or device rotating in unison with the clamp-operating cam or disk, and connections between the said rotating cam or device and depressor, whereby the cutter is thrown into action.

"(22) In a machine for stitching buttonholes, the combination, with a stitch-forming mechanism, a work-clamp, and mechanism for operating the latter, of a cutter-bar, sliding vertically in the head of the machine, and entirely disconnected from the needle-bar thereof; a cutter of suitable length to cut an entire buttonhole at a single stroke; a slotted throat-plate, through which the said cutter can descend; a depressor operated by the needle-bar actuating mechanism, to cause a descent of the cutter-bar and cutter as a buttonhole is being completed; a cam or device rotating in unison with the feed cam or disk for the clamp; and connections between the said rotating cam or device and depressor, whereby the latter is thrown into action to operate the cutter."

"(28) The combination, with a buttonhole sewing machine, of a cutter, a cutter-carrier, a cam from which motion is transmitted to the cutter-carrier to depress the cutter, and mechanism whereby the depression of the cutter from the cam will be produced but once, and after the stitching of the greater part of a button-hole, substantially as specified."

The circuit court held that defendant's machine infringed claims 21 and 22, but did not infringe claims 1, 2, 4, 5, 7, 15, and 28.

Osterhout Patent.

Defendant's Machine.

Edwin H. Brown, for complainant.

James H. Lange and Livingston Gifford, for defendant.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge (after stating the facts). Machines of this general character comprise work-moving mechanism, stitching mechanism, and cutting mechanism. With the cutting mechanism only is this suit concerned. The threads which surround and reenforce the sides of a buttonhole extend from the edge of the buttonhole backward into the cloth, being inserted in the cloth by a succession of alternate stitches, known as "edge stitch" and "depth stitch." The machines that make these stitches operate in one of two ways: either the cloth feeds forward lengthwise of the buttonhole, without any sidewise to and fro motion, and the needle is itself jogged sidewise to or fro after each stitch, or else the needle reciprocates vertically without any lateral motion, and the clamp which holds the work is given the jogging motion, so that the needle will stitch alternately "edge" and "depth." The patent in suit is concerned with this latter class of machines, and it provides for cutting mechanism whereby the buttonhole may be cut while it is being stitched. The work clamp which holds the cloth has two motions; a forward motion, or forward feed, which pushes it along in the direction of the length of the buttonhole without retrogression; and a to and fro or jogging motion at right angles to the length of the buttonhole. The succession of movements in forming the stitches are these, a starting point being taken when the work-clamp is jogged out so that the edge-stitch line is under the needle: (1) The needle descends, and then (2) it ascends, making an edge stitch. (3) The work-clamp jogs in, bringing the depth-stitch line under the needle. (4) The needle descends, and then (5) it ascends, making a depth-stitch. (6) The work-clamp jogs out, bringing the edge-stitch line under the needle, and (7) either simultaneously with 6, or afterwards, and before 8, the work-clamp moves forward so far as may be necessary to secure the predetermined distance between the pair of stitches already formed and the next pair. (8) The needle descends, and then (9) it ascends, forming another edge-stitch. And so on in the order set forth. The cutter is fixed to a cutter-carrier, which reciprocates vertically as the needle does, when thrown into engagement with the needle-carrier. When not thus operated upon by the depressor of the needle-carrir, it is inoperative. The cutter may be of width equal to the length of the buttonhole, in which case it will be necessary only to provide means for making it descend once; or it may be narrow, in which case successive plunges must be provided for. Of course, it does not descend in the same plane as that which contains either line of edge stitches, and therefore not in the same plane as the needle. The plane of its operations lies between the two lines of edge-stitches. And it is manifest that whether it be a broad knife or a narrow one, and on whichever side of the needle it plays, it must be so arranged that it will descend only in its own proper plane. If, for instance, it is in such proper plane when the needle

is in edge-stitch position, it will be out of its proper plane when the needle is in depth-stitch position; and if it descends there it will cut the cloth in such wise as to ruin the buttonhole. And the patentee states in his specification that he so arranges and adjusts "the cutter and its carrier that they will be depressed to cut the middle line or slit of the buttonhole when the needle descends in or nearly in that line as in making the edge-stitches, or when the needle penetrates the work at a distance from that line, as in making the depth-stitches." The combination of parts by which this is accomplished is, briefly stated, thus: A cutter-bar, sliding in guides at one side of the needle-bar, and normally detached from other parts, is adapted to be thrown into engagement with a depressor on the needle-carrier, which, when the needle descends, will carry down the cutter-carrier with it. When the needle-carrier ascends, the cutter-carrier is, by means of a spring or similar device, elevated with it, and thrown out of engagement with the depressor. Engagement is effected by means of connections between the cutter-bar and a so-called "cutter-controller," located on the work-clamp mechanism. The following excerpt from the opinion below correctly describes this part of the apparatus:

"P of the patent drawings represents the cutter-controller, a laterally-projecting finger attached by means of screws to the feed-wheel disk, F, arranged to be operated by means of teeth in said wheel engaging a ratchet or pawl, motion to which is imparted by the motion of the main shaft of the machine. [This disk revolves, without retrogression, in the direction of the hands of a watch, and it moves synchronously with the forward feed of the work-clamp. When that forward feed ceases temporarily to allow the needle to make an edge and a depth stitch, the disk for a like period suspends its revolution.] As this disk revolves, it brings the projecting point of the cutter-controller into engagement with a vertical finger on the arm, L, of a lever, which so moves the arm, L¹, of said lever, acting by means of hinges upon the vertical cutter-carrier, I, as to cause the cutter-bar to slightly rotate, and to bring the clutch, J, on the cutter-carrier, and the clutch, J¹, on the needle carrier, A, into engagement. Thereupon the downward movement of the needle-arm depresses the cutter-carrier, and the cutter passes through the fabric. Upon the upward movement of the needle-carrier, a spring causes the clutches to be disengaged, and another spring, K, upon the cutter-carrier, elevates the cutter."

Moreover, as this rotary disk, with its projecting finger, P, is mounted on the work-clamp mechanism, it has, besides its rotary motion, the same to and fro or jogging motion which the work-clamp has.

The patent is long and complicated. It covers 14 pages, contains 30 claims, and is accompanied with 59 drawings. The evidence is voluminous, and the judge who heard the cause in the circuit court has elaborately discussed the patent, the defendant's machine, and the prior state of the art. It will not be necessary here to go over all the ground so carefully covered. In most of his conclusions as to the prior art, the invention of Osterhout, and the relative dates of other inventions, we concur. The case has been much simplified here by concessions made upon the argument. The defendant concedes that invention was exercised on the part of Osterhout in his solution of the problem how to connect a cutter mechanism with the feed-wheel so that it would be automatically operated during a portion only of the stitching period, and so oper-

ated as to cut when making the edge-stitch, and not to cut when making the depth-stitch, in a buttonhole sewing machine of the type in which the cloth clamp has a jogging movement to make the edge and depth stitch, and a cycle of feed movement to lay the stitches about the buttonhole. The complainant has also upon the argument made concessions as to his utilization of the jogging movement to effect this result, which will be referred to in more detail after stating the conclusion arrived at in the circuit court, in the following quotations: "The device of defendant is so constructed that it is not dependent upon the jogging motion of the feed-wheel mechanism for the determination of the number of strokes of the cutter." "The complainant's device is thus dependent." Therefore it is "necessary to limit certain claims of the patent [1, 2, 4, 5, 7, 15, and 28] to a cutter-controller which determines the duration of the cutting period." "Claims 21 and 22, however, cover the finger device used as a starter, and nothing more." "The original application covered a construction whereby the cutter might be put in engagement independent of the jogging motion." "The original application described an operative device actuated by a cam working in harmony with the progressing movement [i. e. the feed-disk rotary movement] of the work-carrier, and not necessarily limited to a construction dependent upon the combined rotary and jogging motion for causing a depression." "Claims 21 and 22 are not limited to a construction moving upon the clamp-feed mechanism, or located on the rotary feed-wheel, * * * but cover broadly a construction actuated by a cam or device rotating in unison with the clamp-operating cam or disk for throwing the cutter or depressor into action." "Inasmuch as the specification describes, and claims 21 and 23 broadly cover, such combination used as a starter, and nothing more, I think these claims are infringed by defendant," which "uses the cutter-controller as a starter." It is manifest that the circuit court was of the opinion that claims 21 and 22 covered a subcombination of the general combinations covered by the other claims, and that complainant's specifications disclosed an embodiment of such subcombination which would be operative as a starter without the co-operation of any jogging movement. The specifications and drawings describe not only a primary type of machine, but also modified forms of the same. Two of these are shown in Fig. 7,—one in solid, the other in dotted, lines,—the latter being referred to in the record as illustrative machine C. Of this complainant's expert testified: "The lever, L, may have the whole of its rocking motion imparted to it by the rotary movement of the cutter-controller." Of still another form, shown in Fig. 23, the same witness said: "[It shows] a cutter-controller performing its controlling function solely by its rotary motion." No doubt this evidence was in the mind of the court when the above-quoted conclusion was expressed. A large part of the expert testimony is concerned with this question of the extent to which the jogging motion imparted by the work-clamp enters into the various devices of the patent, and the briefs are filled with quotations from the patent itself, and from the file wrapper and contents, which are believed to support one or other contention. All this may be

eliminated from this opinion in view of complainant's concessions upon the argument. In the primary form of machine, if the work-clamp is jogged out, the rotary feed disk may be revolved indefinitely, and the finger or controller, P, will not come into engagement with the lever which starts connection between cutter and depressor. The jogging movement is essential to bring it into such engagement. Engagement and consequent starting is impossible until the work-clamp jogs in carrying the feed disk and finger, P, with it. This the complainant now concedes. In the form shown in Fig. 7, dotted line, the controller jogs, and this jog of the controller is necessary to bring it into position for operating upon the adjacent lever, by which the cutter-bar is shifted into engagement with the depressor. After the cutting has been done, the jogging movement of the controller moves it away from the lever, so that it may pass by the lever. This, too, the complainant now concedes. In the form shown in Fig. 23 the controller itself has no jogging motion, but the mechanism which effects the connection with the cutter-carrier is more complex than in the other forms. The fact is that the projecting finger, P, shifts the part $g^2$ into position to be operated upon by a projection, $g^3$, on the lever, H, which has a jogging movement, and that the jogging movement of this lever completes the movement of the cutter-carrier necessary for engaging the latter with the depressor. The jogging of this lever in the other direction permits the cutter-carrier to be released by the depressor. This also is now conceded by the complainant. Here the controller is really a compound one, to whose efficient action jogging motion is essential. As to the general form of Osterhout's machine as shown in Fig. 2, complainant also concedes that the jogging movement would be necessary for disengaging the parts if a multiple cutter was used; but insists that this would not be so when a single-stroke cutter is employed. It is unnecessary, so far as claims 21 and 22 are concerned, to review the facts or the arguments by which defendant controverts this last proposition. The above concessions, which cover the starting of the cutter in each form of machine, are sufficient. Certainly it is essential to an automatic cutting device embodied in a sewing machine that it shall at least begin to cut. That function is quite as important as it is that it should cease cutting at some appropriate time. In view of these concessions, it is a sound contention of defendant that Osterhout, so far as this record shows, "never invented any cutter mechanism except one having a controller, the fulfillment of whose function necessarily depended upon the jogging movement of some part of the work-moving mechanism; that he never illustrated or described any other cutter mechanism; and that he therefore failed to show how any cutter mechanism could be operated otherwise than through the jogging of some part in the work-moving mechanism."

The next question is whether the jogging motion is to be considered a part of these several claims. In some of them, where the cutter-controller is described as "connected to and moving with the said work-moving mechanism," the language of the claim plainly includes the jogging motion, for when the work-moving mechanism

has a jogging motion whatever "moves with it" has the same. But in others, such as claim 21, where the controller is described as "a cam * * * rotating in unison with the * * * disk," the language does not specifically include the jogging motion. But is it any the less a part of the claim? The specifications point out methods whereby the "intermittent to and fro movements" may be availed of to insure cutting at the proper time and in the proper place. "To cause the cutter-carrier," says the patentee, "to be engaged with the needle-carrier, and depressed by it, to cut the work at one descent of the needle-carrier, and to be not engaged with the needle-carrier, nor thus depressed by it, at its next descent, or to cause the cutter-carrier to be engaged with the needle-carrier, and depressed by it to cut the work only when the work-carrier is at one end only of its momentary to and fro movement (what I have called the 'zig-zag movement'), I suitably connect the clutch for temporarily engaging the cutter-carrier with the needle-carrier with a suitable part of the mechanism of the sewing machine, such as the part B, C, D, F, G, H, or $H^1$, which has a movement in one direction, * * * at the momentary movement of the work carrier in one lateral direction, and which has a movement in the opposite direction at * * * the next lateral momentary movement of the work-carrier in the reversed direction." Without making use of this lateral movement or jog, the subcombination of claims 21 and 22, and, indeed, the combination of each of the claims, would remain inoperative. If it were inoperative, it would be without utility, and therefore unpatentable. The claims in question, therefore, can only be sustained by reading into them the jogging motion, without which the combination set forth in the claims will perform no function.

The only question then remaining in the case is whether defendant's machine infringes. Defendant starts engagement by means of a projecting finger on the rotary feed-disk, which engages with a finger on the connecting lever, which is mounted on a tubular rock-shaft, and which moves the cutter-bar into proper position to begin to cut; but the use of a finger or trip on the feed-wheel to start other mechanism was old in the art. By reference to the statement supra as to sequence of movements, it will be observed that we have a forward move, followed by a jog in and by a jog out, and then another forward movement. There are thus two jog movements to one forward movement, and the three movements of each group come always in the same order. The machine being arranged so that the jog immediately succeeding a forward move leaves the work-clamp in proper position for the descent of the needle, the trip or finger may be located anywhere upon the periphery of the feed-disk, because, wherever placed, it can only start the cutter at a time when the work is in proper position to be cut. The defendant's machine is a single plunger, using a broad knife, and it is, of course, necessary that, having once descended, the cutter shall not descend again. It will be remembered that complainant has conceded that when his machine is arranged as a multiple cutter the jogging motion is essential for disengaging the parts.

We are satisfied that it is also essential for disengaging when a single cutter is used, for these reasons: The engagement between the projecting finger, P, and the lever not only rocks the cutter-carrier into proper position to be caught by the depressor, but holds it in that position as long as the engagement of P and the lever continues. Therefore, so long as such engagement continues, each descent of the needle-carrier (to which the depressor is attached) will bring down the cutter-carrier. If that engagement is left to be broken only by the forward movement of the finger, P, moving rotarily with the feed-wheel, there would be two descents of the needle and cutter, since, after each forward movement, and before the next one, there are always two jog movements. And one of these descents would take place when the work was not in proper position, and the cloth would be cut somewhere on the line of stitches. In complainant's machine it is the jog out which saves this catastrophe. The same jog which puts the work in wrong position for cutting invariably puts the projecting finger in such position that the engagement with the lever which sets or keeps the cutter in action becomes impossible. In the machine of the patent, therefore, the jogging motion is essential to both engagement and disengagement. In defendant's machine, however, it is utilized for neither. As the circuit court found, defendant has "demonstrated that its machine did not use jogging motion at all in connection with the action of the cutter-operating mechanism, and only used the rotary motion to start the cutter device by a pin, and did not depend on any contact surface to determine the cutting operation." The manner in which defendant starts its cutter devices has already been shown. It stops their action as follows: Engagement of the pin or finger on the feed-disk with the finger on the tubular rock-shaft (which takes the place of complainant's lever connection) causes a clutch on the cutter-actuating rock-shaft to be engaged with a shoulder on the needle-actuating rock-shaft. As long as the clutch is held by this shoulder, both shafts will rock together, causing both needle and cutter to descend. The shoulder is the equivalent of complainant's depressor. And so long as the engagement of finger with finger keeps the tubular (or lever) shaft rocked so as to retain the clutch in position to be caught by the shoulder, the hold of the shoulder will not be broken by the spring, which would otherwise throw the clutch out of engagement. If the machine depended only upon the further rotary movement of the feed-disk to carry its finger out of engagement with the tubular shaft finger, it would be useless, for the reason already pointed out, viz. there would be two descents, and therefore two cuts; one necessarily when the cloth was in improper position, before the forward feed motion could effect disengagement. To break engagement, defendant places on the cutter rock-shaft a snail-cam, which is so located relative to the tubular or lever shaft that, as the cutter-shaft rocks, the snail-cam depresses the tubular shaft, and breaks the engagement with its finger with the finger on the feed-disk. In consequence, the rocking motion of the cutter-shaft, which causes the first descent, at the same time absolutely prevents a second descent by removing from engagement one of the two fin-

gers whose engagement alone makes a descent of the cutter possible. Complainant's expert admits that it is the snail or "scroll cam on the cutter shaft that produces the disengagement of the controller, so that the disengagement cannot possibly take place before the cutter descends once, and the engagement cannot possibly continue after the cutter has descended once, no matter what the fineness or coarseness of the stitch." Having once started the connections which put the cutter mechanism into operation, the feed-disk finger has no further control over them; the cutter mechanism itself contains devices which, independent in every way of the starting pin, effect a breaking of the engagement, and a stoppage of the cutter mechanism; and which do this with no assistance in any way from the jogging movement. We concur, therefore, with the judge who heard the cause at circuit that defendant's machine does not infringe claims 1, 2, 4, 5, 7, 15, and 28, for the reason that it has not the cutter-controller, which determines engagement by the utilization of the jogging movement, but a different mechanical device, which does not at all avail of that jogging movement. And, as already pointed out, we do not think claims 21 and 22 can be differentiated on any theory that they cover the finger only as a starter operating solely by rotary feed motion, since the jogging motion is essential to start complainant's cutting devices, and defendant makes no use of such jogging movement, even as a starter.

An interference was declared in the patent office between Osterhout's application for this patent and an application of Tebbetts & Doggett. The cutter-actuating mechanism of defendant is substantially that of Tebbetts & Doggett. The issues in interference were framed on claims contained in Tebbetts & Doggett's application. They are textually the same as 21 and 22 of this patent. Default was made on the part of Tebbetts & Doggett, and upon such default priority of invention was awarded to Osterhout. It is contended by complainant that not only is the question of priority res adjudicata between the parties to the suit, but that defendant is also precluded from contesting the validity and scope of claims 21 and 22 of the patent in suit, and infringement of the claims by defendant's machine. The theory of this contention is that under the rules and practice of the patent office either party has a right to move to dissolve an interference on the ground that, in view of the state of the art, the issue framed therein could not be based upon his invention as described and claimed; that failure to move for such dissolution amounted to an acquiescence in the holding of the patent office that the inventions of the two parties as limited by the prior art there shown were identical; that they were patentable despite the prior art, and that either might properly be the basis for claims corresponding to the interference issues. And therefore, that, although it now appears that the original Tebbetts & Doggett claims—now claims 21 and 22—correctly cover defendant's machine, but do not cover complainant's unless an unexpressed element is read into them, defendant cannot now avail of that fact to limit these two claims of the patent. We are referred to no authority in support of this contention. It has not been the tendency of the decisions either

of the supreme court or of the circuit courts or courts of appeal to extend the effect of interference decisions as final adjudications, and we concur with the circuit court in the conclusion that, "while the decision in interference may be res adjudicata as to priority, it does not preclude defendant from raising other questions not in issue in said proceedings." The decree of the circuit court is reversed, with costs, and cause remitted with instructions to dismiss the bill.